Thank you. Good morning, Judges of the Court of Appeals. I'm Tom Gerrard, and I'm arguing this morning on behalf of the defendants, I reserve two minutes for rebuttal. Your Honors, I submit that the key to understanding this appeal is to embrace just what the situation was that the New Haven police walked in on, on this day in October of 2010. We're talking about a second floor bar. There's a stairway up. It has occupancy of 150 people, and there's 250 people in the bar. There are Yale students mostly, mostly underage, and the fire marshal wants in. He wants to count heads and to write up the owner. The Liquor Control Commission wants in. They want to check for underage drinking and write up the owner as well. And it was the New Haven police officer's responsibility to get these civilians into this area so that they could do their job. And if you can imagine what they encountered, you have seven to ten police officers dealing with 250 kids. It's 1230 at night. They've been partying until 1230, and they come in by surprise and say, we're here to count heads and check IDs. So crowd control was a challenge, to say the least. And what we submit is that based on the actions of Jordan Jefferson, our plaintiff, just on just what he says he did, nothing else but his version of the event. So that's why we're here. Mr. Girard, so that at least I and you are on the same page, and I assume maybe my colleagues as well, would you just recite what you believe are the facts that confronted the officer with respect to Jordan Jefferson? Yes. I assume you're referring to the plaintiff's view of the facts. Exactly. Yes, yes, absolutely. What facts are we going from when we determine, well, when we review whether your office, your client should have had qualified immunity? Yes, understood. He was told to not use a cell phone, to put a cell phone away. Right. And he took his cell phone out and pressed a key or two. To turn it off. Well, that's his version, to turn it off. And that's the one we are using, right? Understood. You're with me so far. Okay, keep going. He was told, he was moved to another area, told not to talk to others, and he was speaking to a friend who was passing by, and he said, and he was told, I was, I thought I told you not to talk to anyone, and he pushes back and saying. What was the basis for the order to not talk to anyone? Because if. Did you call an attorney at that point in time? No, I would say. Was he under arrest? No, it's an investigative detention. He wasn't under arrest. If anything, it was investigative detention in support of this Liquor Control Commission and. So he had perhaps even more right to contact somebody outside, right? He's not under arrest. He wasn't told he couldn't go anywhere. Well, he was told to stay right where he was. Yes, he was told that. And the basis for that was? Because they were doing a check for underage drinking, a protective suite, underage drinking, and fire code violation. So this would be an investigative detention. He was not free to leave from where he was. So what did the officer have probable cause to do based on the fact that Mr. Jefferson took out his phone and turned it off? The facts, I mean, we're stuck with those facts right now. And said, when asked by somebody passing by, are you okay? And he said, yeah, I'm okay. Well, that's really just strike two, and we're not claiming that. There's a strike three to this. It's very important. No, but he said you're under arrest. Well, no, this hasn't happened yet. Okay, sorry. Keep going. When he said you can't talk to this person, and then he pushes back, why not? He's my friend. Then you're under arrest. So based on that. Oh, sorry, I forgot the last part. Okay, so. And that's key, because now we have interfering with police under Connecticut law is laid out in our brief very clearly. You don't have to have a successfully completed interfering wholly or partially. That's State v. Alloy, cited at page 26 of our brief. I think the best decision this Court can rely on. Just asking the question is the tipping point. Yes, and the reason. Do you have a case that says that, that that amounts to interference with a police officer? I would refer you to not just State v. Alloy, which is on page 26 of our brief, but Judge Cabranes of this Court sat for many years in the New Haven District Court, and he authored a decision that exists. U.S. District Court that happens to sit in New Haven. Yes, exactly. Difference, right? Yes, I'm sorry. U.S. District Court for Connecticut. He sat in New Haven for many years. And he decided, Herpel v. Joyce, page 31 to 32 of our brief, and he explained that even passive resistance causes a distraction, and it draws the officer's attention. And in cases where police are outnumbered at a scene, any distraction is interfering. And so he's interpreting Connecticut law, and there's a long quote from that case, and that really, I think, is the linchpin to what we have here. Because if our New Haven police officers had Judge Cabranes' decision in their back pocket and they had just studied it, there is absolutely no way this could be unqualified immunity, a not-arguable probable cause. Because if every one of those — But what about State v. Williams from the Connecticut Supreme Court? Doesn't it require more than that? Well, our scenario, I think, is different because we have 250 people, and if every one of those 250 people wanted to just say one little thing, wanted to just turn their phone off and press a few buttons, then it's chaos. Saying one little thing entitles the New Haven police to arrest you for interfering? Under our circumstances, yes. If this was a two-person motor vehicle stop and you have two guys sitting on the curb and they're talking, you know, and say, Why can't I talk to him? And he protests, well, now you're under arrest for interfering. That's a different story. This is a 250-person bar, 250 college kids who have been partying. It's 1230 at night and the police have surprised them. So that's a totally different circumstance that picks up just on what Judge Cabranes is talking about here. So — Can I ask you about something else, and that's supervisory liability? Right. There's an issue here whether you raised qualified immunity as to the two supervisory New Haven police officers or whether you just raised it in your reply brief. I didn't see it in your initial brief really phrased that way. I know you raised supervisory liability, but that's not something that there's an interlocutory appeal for unless it's in the context of qualified immunity for that. So did you raise it? Well, we claim that we raised it, and this is why. Because in the Saucier v. Katz qualified immunity analysis, the very first step in the analysis is, Was there a constitutional violation? And then the second step then is, Was the law clearly established on that? And so what we're claiming in our case is that the men were on the first floor, meaning the two supervisors were on the first floor. So we're not really arguing law. It was clearly established they were not there when the incident happened with Mr. Jefferson. And that's the only way we can do it. They still, we claim, have a right not to have to go to trial if the evidence is clear that the first step of a qualified immunity analysis could never be proved. I'm just asking whether you raised it in that way. Yes, that's how we. It's a very technical question, really. You know, I know you've raised supervisory liability as to those two defendants, but did you raise it in the context of qualified immunity, which is something we could review at this stage in the case? Well, we claim, we haven't, we didn't raise it the way I just articulated it, but we did raise the issue of they were on the first floor, there was no issue of fact that they were on the first floor. Did you use the phrase qualified immunity at, before the district court at that time? Before the district, well, there was no oral argument, so we didn't use it before that. We rely on what, just what the motion says and what I'm saying today. Fair enough. But the way we have, the only way you can say it, you're not going to say that because of this case, there's no liability. There's no liability because you can never get through step one on the saucier analysis. That's the only way we could, that's the only way we could do it. So we just said there's no liability. I just want to point, Your Honors, to page 4, I'm sorry, 417 and page 433 of the joint appendix. It's the same piece of testimony and what they, what that is is Sergeant Jalouz's testimony that they claim is the reason why there's an issue of fact on where the supervisors were doesn't actually support that because as to Supervisor Melendez, the Sergeant Jalouz has said, I don't know his exact position. I'm going to assume, which is very bad, but I'm thinking he's with the lieutenant, but you don't know? No, I don't know. And then regarding Chief Lamone, what about Lamone? Do you know where Lamone was? No, I do not. So I submit there's no issue of fact. I'll reserve my remaining time for rebuttal. Before you sit down, could you just give me the joint appendix page numbers? Yes. 417 to 433. No, it actually, the same piece of transcript appeared twice in the joint appendix. The same exact excerpt is on 417 and on page 433. You can find it in two places. All right. Great. Thank you. Thank you, Judge. Ms. Payne. Good morning, Your Honors. My name is Rosemary Payne. I represent Mr. Jordan Jefferson, the plaintiff appellee in this matter. Your Honor, I suppose there are, I think there are many different versions of what happened here, but in the light most favorable to the plaintiff, I'd like to point out some additional facts in the record. Attorney Girard indicates that this is a second floor club, that there's one way up, et cetera. There's more to the story. What the record shows is that this was a Yale-sponsored college event. In the opinion or the words of the DJ who's in the business of doing these kinds of clubs, this was one of the better run events. The police come up and almost immediately lights are on, music is off, and control is established. That is in the record in various places. In terms of how this place got chaotic, a review of the record in the light most students in the affidavits and with Mr. Jefferson, the chaos was caused by the police themselves. So you agree then that we can consider the context. I mean, I think that Mr. Girard argues that, that you have to think about what was going on in the club, not just with Mr. Jefferson. In other words, it sounds kind of not enough for interfering. I just want to talk to my friend. I'm turning off my cell phone. But if there's chaos surrounding that and the police are trying to control a crowd of 250 people, can that be considered? Actually, not on this record because on this record at the time those words were exchanged, I believe all the officers agree and all the students agree, the students were filing out. What happened here, let me just give a brief summary of the facts here. This is Operation Nightlife. And there's a new chief in town, Chief Lamone, and they come up with a plan to do liquor compliance checks. Alchemy Elevate, which are the two clubs that are up and down, are the clubs that are on a list. So this is supposed to be just a liquor compliance check. And through the actions of mostly Lieutenant Reddish, this turns into actions of the police with a raid, with guns, threats, violence, et cetera. So when you look at how this gets started, it immediately starts to go awry. But what the students themselves have said, what the staff has said, is that almost immediately there is compliance. And so when you look at all the context, you have to look at the up and down. Even though the police made it chaotic, at the time Mr. Jefferson said, I can, can I talk to my friend or questions, which is allowable under Connecticut law, everything was orderly. So considering the context at that point, in the lightning speed of light. Sotomayor, or at least we have to assume that in analyzing the qualified immunity claim. At least we have to assume that everything was orderly in analyzing the qualified immunity claim. It may turn out to be otherwise if this case goes to a jury. What we are saying here, and it goes for the qualified immunity argument as well as the substantive summary judgment issues, is basically assuming all facts. And I would take issue with Mr. Girard saying it's not just what comes out of the plaintiff's mouth. It's the plaintiff's version or the facts most favorable to the plaintiff. And what that shows is that for whatever reason, despite the fact that the plan called us for otherwise, for some reason, Lieutenant Jefferson decides he has to come up there and be a part of this. And if you recall, he says, I had to take charge, but I wasn't taking charge. This is Lieutenant Redish. This is Lieutenant Redish. Was he in SWAT gear at the time? He was in SWAT gear, gun, and there's plenty of statements from the students that, you know, the students were terrorized by the people. One student, I believe, said something to the context of bring this guy over here. He needs to see your gun, that one of the other officers said this. So by all accounts the guns were not drawn at all that night, were they? Excuse me? The guns weren't drawn. Correct. But they were slung, you know, and it was a big gun. It was an assault rifle, right? Assault rifle, yes. So in the context of this, looking at this in the context, let's look at what the actual cell phone orders were. And what we have is Chief Melendez, Assistant Chief Melendez, says he told the students to put away the cell phones for the time being, but said it was okay to hold your cell phones. Sergeant Julaza says remain off of your phones. Police Officer Abate says the students were told to stay off their phones. Lieutenant Reddish says he told the students to turn off their cell phones, put them down, and alternatively turn off the phone and stay off the phone. Other officers don't remember anything. So when you look at the context of what these students were told, whether it was an order, whether it was a request, what was going on, one must look at was the order clearly communicated. And when we're looking at that in the context of college students where there's evidence that this party was winding down, things were orderly, people were, all they were doing was asking questions and becoming upset. And then you have various discussion about what you should do with your cell phone. Just to go back to Mr. Jefferson, he makes it clear, I was taking it out, it went off, I didn't want to disturb anything. Reading this in the light most favorable to Mr. Jefferson, he was following Officer Reddish's instructions of turn it off. This is the colloquy. He says he was singled out for having his phone out. That is the reason, he says, Lieutenant Jefferson, Reddish gave. This is the colloquy at deposition. Question, all right, and when you had your phone out, what were you doing with the phone? Answer, I'd gotten a notification, so my phone had went off. I took it out, I looked at the notification and put the phone on silent. That's when he saw me. And then he's asked about the notification. He says, it was from my app. I didn't know it at the time, but my phone made a noise. And then he's asked, he's asked by Attorney Girard, and then Lieutenant Reddish comes to you and says, put the phone away. And Mr. Jefferson says, no, he does not. He says from across the room, stand up and come over here, a command for which he complied. And then he's asked, did you hear any orders before that the people were to be seated not to use their cell phones? He says, I did. And then Attorney Girard asks him, so why is it that you pulled your phone out and looked at the notification? And this is important. Mr. Jefferson said, wait a minute, what was the order again? So Mr. Jefferson himself does not know what the order is because the order is not clear. And these are all facts that need to get established at trial. And Mr. Jefferson further explains when he's asked why he took it out, because my phone went off and I didn't want to further cause any disturbance. And then there's more back and forth. And he says further, if someone had called me, it would have continued to ring, so I thought it best to turn it off. And then finishes by saying, he's asked, so are you saying you removed the cell phone from your pants for the purpose of turning it off? He says, yes, for no other purpose, correct. And then what happened? Reddish ordered him over. And then he says, he goes over as instructed, he's perfectly compliant. So what the record shows is it's almost three versions, actually. All right. We're up to that point. Can I jump you ahead to the... Sure. I'm sorry. No, no, don't apologize. We jump ahead to the point that I think I or several of us were asking about, which is this conversation or quick interchange between Jefferson and another person. Right. And it was after that that he was arrested. So what are the facts? I mean, did Mr. Gerrard and I and the Court have the facts right around that interchange? The exchange, I believe, is an indication that for Mr. Jefferson that he, first of all, I don't believe there's anything in the record that shows he was told. He was told and directed to go sit down. He was not told to. At one point, the students were told in the beginning when Lieutenant Reddish barges in, sit the F down, shut the F up. But at this point, things are much more calm. Mr. Jefferson is told to go sit down. He's not told not to speak. And at that point in time, he has a brief and polite exchange. He says he was using a normal voice. Under those circumstances, a question is allowable under Connecticut law. And I see that my time is up. I can address some supervisory liability issues, but if the Court is satisfied. Let me just add, I have a quick question about that, and we'll, of course, give Mr. Gerrard opportunity further to argue if he needs it beyond his two minutes. I understand the record to be it's disputed whether, sorry, that there are two officers in white shirts, that's Lyman and Melendez. And there is a dispute of fact as to whether they are present, and if so, where they are in the establishment. Correct. Do I understand the record correctly on that issue? What I understand is there's no dispute both of them were in the facility. There is no dispute that both of them had multiple opportunities to observe and, in fact, participates. There's one student that directly says Assistant Chief Melendez used profanity. At some point in time during the tasing, we believe that office, excuse me, Chief Lemone was not present for the tasing. But for all other aspects, it is in dispute as to precisely where there are, but there is ample evidence they both had the white shirts to know. Is there any evidence that Chief Lemone participated in the arrest at all or made the decision to arrest? There's, other than being, allowing things to go forward, there's no direct evidence that he was part of the conversation to arrest Mr. Jefferson. Your cause of action against him is based on supervisory, his supervisory role? But also some direct participation role in terms of. It's both. And gross negligence in the supervision of subordinates. But if it's both, it's possible, is it not, that we have jurisdiction over his personal and non-supervisory role, but not over his supervisory role, because it's not qualified. I would agree with that. And I would also point out that with respect to both of them, both Melendez and Lemone, there also is a lot of dispute of fact as to who was actually in charge on that evening. And nobody seems to know, or none of the officers. There's great disagreement, I should say. All right. I'll ask Mr. Girard this. What's your understanding? I assume that Lemone and Melendez. Sorry, just one last question. Well, I'll ask you both, but Mr. Girard will get a second. Both of the chief and the assistant chief outrank Mr. Reddish, sorry, Officer Reddish, Lieutenant Reddish. Correct. Okay. Thank you. Okay. That was an easy one. I didn't need the book. All right. Do you agree with that, Mr. Girard? Yes. Yes. Assistant chief and chief outrank the lieutenant. Just briefly, Your Honors, there is no. You have two minutes, but we're going to give you what time you need to. Thank you. Your Honors, the seven men who bring this appeal have been sued individually. They have personal liability and personal exposure to their assets and their plans for their life and their family and all of that. So it's very important that they are able to raise qualified immunity as to the false arrest piece, even though they're going to have to sit for trial on the excessive force piece, because it takes a huge part of the exposure, this personal exposure, away from them, and it's their claim, and I think it's well made, that this amounts to probable cause to arrest for interfering at least on our record. So you made a decision not to indemnify these defendants in the event an unfavorable verdict occurs? I don't want to say that's a firm decision, but I am retained specially to represent the individuals so that they, and they've been put on notice that there is no coverage or indemnification for intentional acts. It depends on how the verdict comes out, obviously, and who did what. But just to reiterate what we were facing here, there are many times where we hear about an unfortunate tragedy, a very overcrowded bar is in play, a fire starts, a lot of lives are lost, and people look after the fact, and they say, how could this happen? How did you get 250 kids in an 150-person space, all these, they're 18, 19, 20 years old, they're all underage, city of New Haven, how is this happening? State of Connecticut, how is this happening? And this is what we're fighting out there. And so it was the right thing for the New Haven police to assist these persons in going up to try to make this inspection so that this bar owner could be written up. And that's the only way it works. You can get your liquor license suspended, you can get, the fire marshal can shut you down and things like that. So it's grossly overcrowded, and it was the right thing to do. And under these circumstances, just using Mr. Jefferson's actions only, that's interfering, that's the distraction, that's when the police are grossly outnumbered, that's what Judge Cabranes was talking about in his decision and in the two Connecticut Supreme Court decisions. And I think that just one comment on the supervisors, there's no dispute that they were not there at the time of this, the only time where there's an alleged constitutional violation, and that's the arrest and the use of force on Jordan Jefferson. Use of profanity is not constitutional dimension. Use of a SWAT team is not constitutional dimension. I've cited those cases, and maybe that's a case for negligent supervision. Maybe they want to talk to the Office of Professional Standards about how their officers are swearing or whatever. That's not a constitutional violation that a supervisor can now have personal liability for not stopping. And otherwise, I'll rely on the brief. Well, could I ask you one question? Sure, yes, Judge Saffer. And that is, have you argued with respect to supervisory liability, have you argued pendant jurisdiction on our part? That is to say, we have jurisdiction not because it's them, but because pendant jurisdiction, because we do have jurisdiction over the other defendants. Well, you won't find that argument in our brief. That jurisdiction may exist, though. Okay. I mean, we do claim there's jurisdiction, but I haven't seen it. No, no, that's fine. I just want to know whether it was in your brief, because I didn't see it. Thank you. Thank you both. Helpful arguments, and we'll reserve decision.